FILLER, WILSON & McCLELLAND, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 21136.   Promulgated July 30, 1930.

*George T. Altman,* C. P. A., for the petitioner.
*Hartford Allen, Esq.,* for the respondent.

#### OPINION.

STERNHAGEN : This proceeding involves a deficiency of $2,317.04 in
income and profits taxes for 1922.   Petitioner seeks personal service
classification, under section 200, Revenue Act of 1921.   The record
consists entirely of the following signed stipulation filed at the
hearing.

It is hereby stipulated:

1. Of the capital stock of the taxpayer, 80% was owned by P. A. Filler,
vice-president.   The remainder, 20%, was owned by Pauline G. Filler, mother
of the said P. A. Filler, and was received by her as a gift from the said P. A.
Filler.

2. The said Pauline G. Filler was a non-active member of the corporation.

3. The said P. A. Filler was regularly engaged in the active conduct of the affairs of the corporation.

4. The gross income of the taxpayer for the fiscal year here under consideration was $79,564.14. As shown on the tax return $78,309.45 of this amount consisted of commissions and $1,254.69 of other income.

5. The total of $30,288.50 shown in Schedule A–12 of the tax return as " Salaries " contains, among others, the following salesmen's salaries:

| | |
|---|---:|
| P. A. Filler | $3,000.00 |
| P. W. Wilson | 3,600.00 |
| George H. McClelland | 3,000.00 |
| Total | $9,600.00 |

The other salaries contained in the said total of $30,288.50 were as follows:

| | |
|---|---:|
| A. T. A. Filler | $7,200.00 |
| Yardmen (average number—4), bookkeeper, comptometer operator, and stenographer | 13,488.50 |
| Total | $20,688.50 |

Said A. T. A. Filler was the father of said P. A. Filler, and husband of said Pauline G. Filler. He served as office manager during the year in controversy. He was, throughout the said year, unable to serve in any other capacity on account of partial paralysis. His duties consisted only of being in the office and nodding assent or dissent to questions put to him.

6. It will be noted that the names of the said P. W. Wilson and George H. McClelland appear in the name of the taxpayer corporation in spite of the fact that those individuals were not stockholders. The exact nature of their agreement with P. A. Filler and the taxpayer is contained in the following:

MEMORANDUM OF AGREEMENT, Made this 10th day of August, 1917, between PAUL A. FILLER, of the first part, P. W. WILSON, of the second part, and GEORGE MCCLELLAND, of the third part.

WITNESSETH :—

FIRST: Said first party is hereby agreed to be the owner of the business now being conducted under the name of Filler, Wilson & McClelland, at 178 Exchange Building, Union Stock Yards, Chicago. Said second and third parties are only nominal partners of the said first party, but consent to the use of their names as partners, and to the use of the aforesaid name of Filler, Wilson & McClelland by the first party during the period of this agreement.

SECOND: And further consent that first party may cause the formation of a corporation under the name of Filler, Wilson & McClelland, for the purpose of carrying on the live stock commission business now being conducted under that name.

THIRD: It is further agreed that said Paul A. Filler, or such attorney-in-fact as may be named by him shall alone have power to sign the aforesaid firm name of Filler, Wilson & McClelland to all notes, checks and other like financial obligations.

FOURTH: First party hereby employs second party as a cattle salesman at a monthly compensation of Two Hundred and Fifty ($250.00) Dollars, plus one-half (½) commissions on all business brought to Filler, Wilson & McClelland by the said second party.

FIFTH: Said first party hereby employs third party as a hog salesman at a monthly compensation of Two Hundred ($200.00) Dollars, plus one-

half (½) commissions on all business brought to said Filler, Wilson & McClelland by third party.

SIXTH: The period of this agreement, including the aforesaid employment of second and third parties, shall end on December 31, 1917; provided, however, that same may be renewed or extended by mutual consent of the parties, and provided, further, that in the event said parties continue their aforesaid association after that period without the execution of a further agreement, they shall be deemed to have continued such association on the same terms as are herein mentioned; and provided further, that in the event of the formation of a corporation by the said first party, under the name of Filler, Wilson & McClelland, for the purpose of conducting such business, this contract may be and shall be assigned to said corporation, and second and third parties shall continue as such employees of said corporation, on the aforesaid terms and for the aforesaid period.

WITNESS OUR HANDS AND SEALS, the day and year first above written.

|  |  |
|---|---|
| P. A. FILLER. | (SEAL.) |
| P. W. WILSON. | (SEAL.) |
| GEO. McCLELLAND. | (SEAL.) |

P. A. Filler, P. W. Wilson and George H. McClelland joined their respective clienteles for their mutual benefit, especially for the sake of exchange of services and economy in office and other expenses, and the agreement marked Exhibit A grew out of the intention of P. A. Filler to incorporate his end of the business.

7. The commissions paid to P. W. Wilson and George H. McClelland under said agreement during the taxable year totaled $9,874.87. This amount is shown in Schedule A–12 of the tax return as "Commissions as Salaries."

8. Consequently under said agreement the gross commissions received by the taxpayer on the business done by P. W. Wilson and George H. McClelland was twice $9,874.87, or $19,749.74.

9. The gross commissions received by the taxpayer on the business done by P. A. Filler alone was $58,559.71, as follows:

Total commissions received by taxpayer (Fact No. 4 above) _____ $78,309.45
Deduct commissions received by taxpayer on business done by P. W.
    Wilson and George H. McClelland (Fact No. 6 above) _____ 19,749.74

    Commissions received by taxpayer on business done by P. A.
      Filler alone_____ 58,559.71

10. The total paid by the taxpayer to P. W. Wilson and George H. McClelland during the taxable year was $16,474.87 as follows:

Salaries (Fact No. 5 above)_____ $6,600.00
Half-commissions (Fact No. 7 above) _____ 9,874.87

    Total _____ 16,474.87

11. The excess of the amount received by the taxpayer on the business done by P. W. Wilson and George H. McClelland over the amount paid them by the taxpayer was $3,274.87 as follows:

Gross commissions received on their business (Fact No. 8 above) ___ $19,749.74
Total paid them by the taxpayer (Fact No. 10 above) _____ 16,474.87

    Excess_____ 3,274.87

12. The total amount paid by the taxpayer to P. A. Filler, P. W. Wilson and George H. McClelland, and included as expenses on its tax return was $19,474.87 as follows:

Salary paid P. A. Filler (Fact No. 5 above) _____ $3,000.00

Total paid P. W. Wilson and George H. McClelland (Fact No. 10
above) _____ 16,474.87

Total _____ 19,474.87

13. The expenses of the taxpayer other than the amounts paid to P. A. Filler, P. W. Wilson and George H. McClelland was $37,400.05 as follows:

Expenses as shown on tax return (not including the so-called "Bad
Debts" explained in Fact No. 17 below) _____ $56,874.92

Total paid P. A. Filler, P. W. Wilson and George H. McClelland
(Fact No. 12 above) _____ 19,474.87

Net_____ 37,400.05

14. P. W. Wilson and George H. McClelland bore personally any losses (such as those explained in Fact No. 17 below) resulting from the business done by them. They also paid their own traveling expenses, and their own Live Stock Exchange dues.

15. The commissions in the amount of $78,309.45 referred to in Fact No. 4 above were commissions for the service of selling live stock.

16. Said commissions were charged according to rates of the Rules and By-Laws of the Chicago Live Stock Exchange in effect during the entire period here under consideration. The minimum rates specified in Rule X therein were the specific rates used by the taxpayer.

17. The taxpayer did no trading on its own account whatever.

18. Of the amount of $3,650.38 deducted on the tax return as representing "Bad Debts," the principal item, as shown in Schedule A–17 of the return, was $2,700.00 labeled "Slimmer and Thomas Case." In this case the money was duly collected from the purchasers of the live stock. However, the consignor, J. M. Maher, of Lake Park, Iowa, had committed a fraud on the taxpayer by consigning to it mortgaged stock. The mortgagees recovered from the taxpayer, and the taxpayer was therefore compelled to turn to the consignor for reimbursement. However, the consignor had committed suicide before action could be commenced, and the taxpayer was able to recover only a small amount from the decedent's estate, which amount was deducted in arriving at the loss shown on the tax return.

The remainder of the $3,650.38 deducted by the taxpayer as Bad Debts contained two actual bad debts, totaling $600.00. as shown in Schedule A–17 of the return. These resulted from advances to consignors. However; these two bad debts were the only losses of that kind deducted by the taxpayer in all five years from 1918 to 1922, inclusive.

The other two items deducted by the taxpayer as Bad Debts on Schedule A–17 of its return total $350.38 and consist chiefly of errors in payments and reimbursements to consignors for minor losses. The taxpayer allowed small overpayments to stand and assumed minor underpayments purely to conserve the good will of the consignors.

19. The total amount of the taxpayer's capital stock, surplus, and liabilities as of the beginning of the taxable year was $44,325.14 as shown in the tax return; and as of the end of the taxable year was $51,504.54.

20. The notes receivable, $8,193.10 as of August 1, 1921, as shown on Schedule K attached to the tax return, consisted solely of personal notes not arising from the operation of the taxpayer's business. The only item on said Schedule K consisting of advances to consignors, as of August 1, 1921, was

$3,840.99, labeled "Advances Shippers." The same item as of July 31, 1922, the end of the taxable year, was $4,461.87.

21. The fair market value of the live stock on which the commissions were earned during the year in controversy was approximately $8,000,000.

22. The petitioner corporation filed its income tax return for the taxable year in controversy (fiscal year ended July 31, 1922) with the Collector of Internal Revenue at Chicago, Illinois.

23. The sum of $1,300, representing additional compensation paid by petitioner for services rendered it during the year in controversy, was disallowed by the Commissioner.

24. Petitioner's gross income of $79,564.14 was derived entirely from services or operations other than trading or manufacturing with the exception of $1,254.69.   (4-5)

Of three errors assigned in the petition, the first was withdrawn at the hearing. The second, complaining of the Commissioner's restoration to income of $1,300 as " Capital, Bonus and Gifts," is covered by paragraph 23 of the stipulation. Respondent admits that said sum represents properly deductible compensation paid for services rendered during the year in controversy, not allowed by the Commissioner. The deduction should be allowed.

The third assigns error in the Commissioner's refusal to grant petitioner personal service classification under section 200 (5) of the Revenue Act of 1921, which is as follows:

The term "personal service corporation" means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include any foreign corporation, nor any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits, or income derived from trading as a principal, or (2) of gains, profits, commissions, or other income, derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

In order to place itself within the classification so defined petitioner must show: "(1) That it is engaged in rendering personal service as distinguished from trading, merchandising or manufacturing; (2) that the principal stockholders are regularly engaged in the active conduct of the business; (3) that capital, whether invested or borrowed, is not a material income-producing factor; and (4) that income is to be ascribed primarily to the activities of the principal stockholders." *Meinrath Brokerage Co.* v. *Commissioner*, 35 Fed. (2d) 614.

The stipulated facts contain no full and accurate description of the character of petitioner's business. While references to commissions received by employees appear from paragraph 7 to paragraph 12, and paragraph 24, which is based on a statement in the return stipulated to be correct, sets forth that substantially all of

the gross income was derived from services or operations other than trading or manufacturing, such evidence throws but little light on the actual conduct of the business, and does not prove that it is engaged in rendering personal service.

In respect of the second requirement, it appears that P. A. Filler, holder of 80 per cent of petitioner's stock, was actively engaged in the conduct of its business and that Filler's mother, holder of the remaining 20 per cent, was not actively engaged. It seems well settled that the percentage of Filler's holdings is sufficient to constitute him the principal stockholder within the contemplation of the statute. *Harry S. Kaufman, Ltd.* v. *Commissioner*, 24 Fed. (2d) 44; *Potts-Turnbull Advertising Co.* v. *United States*, 37 Fed. (2d) 970; *MacMartin Advertising Agency, Inc.*, 11 B. T. A. 162.

In respect of the use of capital as an income-producing factor, it appears that " the total amount of the taxpayer's capital stock, surplus, and liabilities as of the beginning of the taxable year was $44,325.14 " and " as of the end of the taxable year was $51,504.44 "; the gross income totaled $79,564.14. It does not appear whether the capital was or was not income-producing, nor is there evidence of the relation between capital and gross income produced. In the absence of such evidence, where the amount of capital employed can not be regarded as negligible, but, on the contrary, where the gross income is of such amount that it could be reasonably attributed to capital, we can not say as a fact that capital was " not a material income-producing factor."

The question to which petitioner's counsel primarily directed the Board's attention was the fourth requirement, that income be ascribable primarily to the activities of the principal stockholders. Petitioner's commissions for the taxable year totaled $78,309.45, of which $58,559.71 was attributable to stockholder Filler and $19,749.74 to two nonstockholding employees. Hence, approximately 25 per cent of petitioner's gross income was not attributable to its stockholders' efforts, and such a percentage so derived is sufficient to exclude petitioner from the classification which it seeks. *James C. Erskine*, 16 B. T. A. 1080.

It is urged, however, that the two employees were merely " nominal," serving for the convenience of those of petitioner's customers who wished to dispose of cattle. Counsel pointed out in argument that Filler was a hog salesman primarily and that petitioner's business was that of selling hogs; that cattle which petitioner's customers " incidentally " offered could not readily be handled by him, and for accommodation the nonstockholding salesmen were engaged to take care of such cattle as might be offered. Counsel's explanation is not only unsupported by evidence, but the fifth paragraph of the memorandum of agreement, setting out the conditions of salesman

McClelland's employment, describes his expected services as those of a hog salesman. The description of the employees' services as "nominal," moreover, is irreconcilable with ;the character of the agreement and their subsequent activities.

It is obvious that these two employees were rendering services to petitioner in its business in addition to the activities of its stockholder. While it is true that assistants in minor capacities, such as clerks and laborers, have frequently been disregarded as income-producing factors in a business, *North American Railway Construction Co.* v. *Commissioner*, 27 Fed. (2d) 493; *New Orleans Shipwright Co., Ltd.* v. *Commissioner*, 27 Fed. (2d) 214, the rule is the reverse when any substantial part of 'the income can be attributed to an employee of importance. *Alexander, Conover & Martin*, 17 B. T. A. 60; *Robischon & Peckham Co.*, 11 B. T. A. 483; *Crider Brothers Commission Co.*, 10 B. T. A. 338; *Patterson Andress Co.*, 6 B. T. A. 392. Wilson and McClelland clearly fall within the latter category, producing by their efforts 25 per cent of petitioner's gross income, which is the "income" contemplated by the statute. *Denver Live Stock Commission Co.* v. *Commissioner*, 29 Fed. (2d) 543; *Jenkins Kreer & Co.*, 17 B. T. A. 202.

But counsel urges that the income-producing services rendered by these nonstockholding employees should not defeat petitioner's right to personal service classification because such activities were merely incidental to the main business. He cites *Atlantic Coast Distributors* v. *Commissioner*, 33 Fed. (2d) 733. The record, however, contains no facts upon which the Board could base a consideration of this question. If the activities of the said employees were merely incidental and for the convenience of customers, the evidence does not so indicate. But such relation, even if established, is insufficient to warrant the Board in disregarding their connection with the business as a whole. *Conklin-Zonne Loomis Co.* v. *Commissioner*, 29 Fed. (2d) 698, certiorari denied 279 U. S. 871; *Thomas E. Basham*, 21 Fed. (2d) 550; affd., 30 Fed. (2d) 97; *David T. Long*, 17 B. T. A. 584; *Jenkins Kreer & Co.*, 17 B. T. A. 202; *Thomas B. Moreland Co.*, 16 B. T. A. 858; *George A. Springmeier Co.*, 6 B. T. A. 698.

In seeking to place itself within the fourth requirement petitioner has nothing better to offer than the small amount of net income attributable to salesmen after their salaries and commissions had been deducted from the gross commissions accruing to petitioner as a result of their efforts. In another year this net income might be much more considerable, but as the Eighth Circuit Court of Appeals said in *Denver Live Stock Co.* v. *Commissioner, supra*, it would be absurd to change the corporation's classification according to the fluctuating earnings of its nonstockholding salesmen.

Petitioner has failed to place itself within the statutory classification under the strict tests which have in many cases been applied to corporations engaged in a commission business. *Meinrath Brokerage Co.* v. *Commissioner*, 35 Fed. (2d) 614; *Hubbard-Ragsdale Co.* v. *Dean*, 15 Fed. (2d) 410, 1013; *Denver Live Stock Commission Co.* v. *Commissioner*, *supra*, affirming 7 B. T. A. 985; *John Dais Co.*, 2 B. T. A. 1167; *Prey Brothers Live Stock Commission*, 9 B. T. A. 534; affd., 36 Fed. (2d) 326; *C. E. McNeill & Co.*, 14 B. T. A. 738; *Kossar & Co.*, 16 B. T. A. 952.

*Judgment will be entered under Rule 50.*